UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

STARSURGICAL, INC.,
    Plaintiff,

v.                                                           Case No. 10CV1156

APERTA, LLC, NOVOMEDICUS, INC.,
DIETMAR H. WITTMANN, and PAUL
VAN DEVENTER,
    Defendants,

DIETMAR H. WITTMANN,
    Third-Party Plaintiff,

v.

MICHAEL DEUTSCH,
    Third-Party Defendant.

---

## DECISION AND ORDER

In 1987, Dr. Dietmar H. Wittmann, an employee of the Medical College of Wisconsin, invented a surgical patch for use in abdominal surgery. In 1988, he assigned the rights to the patch to the college's research foundation, which in turn granted a license to use the patch to Michael Deutsch. Deutsch attempted to obtain approval to market the patch from the Food and Drug Administration ("FDA") but was initially unsuccessful. He then went into business with Wittmann, and in 1999 they secured FDA approval and in 2000 formed Starsurgical, Inc. ("Star"), the plaintiff in this action. Deutsch owned 51% of Star and was president of the company, and Wittmann owned 49% and was vice president. They decided to market the patch as the "Wittmann Patch." Subsequently, a disagreement

developed between Deutsch and Wittmann. Wittmann objected to the manner in which Star was marketing the patch and the high price it was charging. In 2001, Deutsch registered the Wittmann Patch with the Wisconsin Secretary of State and assigned his rights to Star. In 2002, Wittmann registered the same mark in his own name with the U.S. Patent and Trademark Office ("USPTO"). In 2002, Deutsch removed Wittmann as an officer of Star.

In 2009, Wittmann formed two new companies, Aperta, LLC and NovoMedicus LLC, to compete with Star. Aperta and NovoMedicus promoted a slightly different version of the patch, which the FDA approved for five or less abdominal reentries, meaning that if a surgeon reopened an abdomen more than five times, the patch had to be replaced. The Aperta/NovoMedicus patch was included in a kit with other surgical materials including a sterile drape, gauze and a razor. The kit was marketed as the "Wittmann Hypopack" and came in a box that listed its components, one of which was the Wittmann Patch.

In the present action, Star sues Wittmann, Aperta, NovoMedicus and its president Paul Van Deventer claiming that they violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by infringing Star's unregistered trademark. Star alleges that defendants' contacted its customers, promoted its patch at trade shows, and advertised on the internet. Pursuant to § 38 of the Lanham Act, 15 U.S.C. § 1120, Star also claims that Wittmann fraudulently registered its trademark. Pursuant to Fed. R. Civ. P. 65, Star now seeks a preliminary injunction preventing defendants from marketing their product as a Wittmann Patch or in similar ways.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."

Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (citations omitted). Granting a preliminary injunction involves the exercise of a very far-reaching power and is never to be indulged in except in a case clearly demanding it. Roland Mach. Co. v. Dresser Indus. Inc., 749 F.2d 380, 389 (7th Cir. 1984). To justify a preliminary injunction, Star must first make a threshold showing that it has a reasonable likelihood of success on the merits, no adequate remedy at law exists, and it will suffer irreparable harm if a preliminary injunction is denied. Ty, Inc. v. Jones Group Inc., 237 F.3d 891, 895 (7th Cir. 2001). If Star makes this preliminary showing, I will then consider whether the irreparable harm Star will suffer without injunctive relief is greater than the harm defendants will suffer if the preliminary injunction is granted, and whether a preliminary injunction will harm the public interest. Id. I use a sliding scale to weigh the balance of harms whereby the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted. Judge v. Quinn, 612 F.3d 537, 546 (7th Cir. 2010); Coronado v. Valleyview Pub. Sch. Dist. 365-U, 537 F.3d 791, 794-795 (7th Cir. 2008). The goal is to minimize the consequences of denying a preliminary injunction to a party who will go on to win the case and of granting an injunction to a party who will go on to lose. Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd., 780 F.2d 589, 593-94 (7th Cir. 1986). Star can establish that it is likely to succeed on the merits by showing that its chances of prevailing are better than negligible. Omega Satellite Prods. v. City of Indianapolis, 694 F.2d 119, 123 (7th Cir. 1982).

To demonstrate a likelihood of success on its infringement claim, Star must establish that it owns a protectable trademark and a "likelihood of confusion" exists between the marks or products of the parties. Meridian Mut. Ins. Co. v. Meridian Ins.

3

Group, 128 F.3d 1111, 1115 (7th Cir. 1997). Defendants do not dispute that the Wittmann Patch trademark is protectable, but assert that Star does not own it and that there is no likelihood of confusion.

I first consider whether Star has rights to the Wittmann Patch mark. Wittmann's certificate of registration from the USPTO is prima facie evidence of the validity of the registration, his ownership of the mark, and his exclusive right to use it throughout the nation. 15 U.S.C. §§ 1057(b), 1115(a). Star's state registration carries no such presumption. However, trademark rights are acquired through use in commerce, i.e. selling products bearing the mark, and not through discovery, registration, or invention of the mark. Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 503 (7th Cir. 1992). Thus, Wittmann's trademark is subject to Star's previously established common law trademark rights. Id. at 433-34. The party who first appropriates the mark through use, and for whom the mark serves as a designation of source, acquires superior rights to it. Johnny Blastoff, Inc. v. Los Angeles Rams Football Co., 188 F.3d 427, 434-35 (7th Cir. 1999).

Notwithstanding that Star sold and promoted Wittmann Patches nationally a decade before defendants, defendants contend that Wittmann owns the mark because he licensed Star to use his name. In making this argument, defendants rely on the related company doctrine, pursuant to which an applicant for a trademark can establish ownership of a mark by showing that it controlled a company which used the mark. See 15 U.S.C. § 1055 ("If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant. . . "); see also § 1127; Turner v. HMH Publishing Co., Inc., 380 F.2d 224, 229 (5th Cir. 1967); Pneutek, Inc. v. Scherr, 211

U.S.P.Q. 824 (T.T.A.B. 1981); Cobra Capital LLC v. LaSalle Bank Corp., 455 F. Supp. 2d 815, 819 (N.D. Ill. 2006). Thus, if Wittmann controlled Star's use of the mark under the terms of the license to use his name, Wittmann could establish ownership of the mark.

However, the evidence in the record indicates that Star will likely be able to establish ownership of the mark. Simply because Wittmann was a shareholder and officer of Star does not mean that he owns the mark. See Ex parte Alexander, 114 USPQ 547 (Comr Pats 1957). He must have actually controlled Star's use of the mark with respect to the quality of the patches. Nothing in the record suggests that Wittmann had such power. Although as Star's vice president Wittmann may have exercised some degree of control over product quality, Deutsch clearly had more power than Wittmann did. Deutsch owned a majority of Star's stock, was president of the company, marketed the patch as he wished, removed Wittmann as Vice President and refused to engage an additional supplier as Wittmann requested. Star, not Wittmann, controlled the quality of the product. Thus, Star will likely be able to establish ownership of the mark. Nor is there any basis for implying that Wittmann was the beneficiary of a trademark licensing agreement. See Villanova University v. Villanova Alumni Educational Foundation, Inc., 123 F. Supp. 2d 293, 308 (E.D. Pa. 2000) ("[t]he test for whether or not an implied license existed is based solely on the objective conduct of the parties").

Next, I assess the likelihood of consumer confusion between the parties' products. In doing so, I consider seven factors: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree and care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and (7) the intent of the defendant to "palm off"

his product as that of another. Autozone, Inc. v. Strick, 543 F.3d 923, 929 (7th Cir. 2008). Although no single factor is conclusive, the similarity of the marks, the defendant's intent, and actual confusion are particularly important. Id.

The first three factors weigh heavily in Star's favor. The parties use the exact same mark on almost identical products sold to the same customers. Confusion is particularly likely because Wittmann is affiliated with both parties and because defendants' Wittmann Hypopack contains a Wittmann Patch, thereby leading consumers to believe that it repackages and resells patches from Star. The fourth factor weighs in favor of defendants because the customers are doctors and hospital administrators and are likely to be sophisticated about purchasing the patches. However, Star presents evidence that as the result of defendants' use of the mark, customers have become confused: one customer attempted to order patches from defendants using Star's product serial number, another called NovoMedicus asking for Deutsch, another attempted to order patches from defendants as opposed to kits, and many contacted defendants with questions about their relationship to Star. Thus, I conclude that Star's chances of demonstrating a likelihood of confusion are better than negligible.[1]

---

[1] Star also claims that defendants infringe its mark by using it as a "keyword" on internet search engine advertising such that whenever a customer performs a search for the phrase "Wittmann Patch" defendants' website appears as a sponsored search result. Star, however, makes no effort to explain how this activity confuses consumers. Cent. States, SE & SW Areas Pension Fund v. Midwest Motor Express, 181 F.3d 799, 808 (7th Cir. 1999) (arguments not developed in any meaningful way are waived); see also Network Automation, Inc. v. Advanced Sys. Concepts, No. 10-55840, 2011 U.S. App. LEXIS 4488, at *37-39 (9th Cir. Mar. 8, 2011) (using a trademark in keyword advertising does not violate Lanham Act absent showing of likelihood of confusion).

Based upon the foregoing, I conclude that Star has demonstrated a likelihood of success on the merits of its infringement claim regarding defendants' use of the Wittmann Patch mark, or similar marks, on websites, promotional materials, and packaging.

To demonstrate a likelihood of success on its fraudulent registration claim, Star must present clear and convincing evidence that Wittmann presented materially false and misleading information to the USPTO in order to convince it to register his mark. Money Store v. Harriscorp Finance, Inc., 689 F.2d 666, 670 (7th Cir. 1982). Fraud exists only where there is a deliberate attempt to mislead the USPTO into registering the mark. Id. It does "not lie if it can be proven that the statement, though false, was made with a reasonable and honest belief that it was true." Smith International, Inc. v. Olin Corp., 209 U.S.P.Q. (BNA) 1033, 1043-1044 (T.T.A.B. 1981).

Star contends that Wittmann perpetrated a fraud on the USPTO by falsely attesting that he was the sole and exclusive owner of the trademark and by declaring that no other corporation was using it or had the right to use it. See 15 U.S.C. § 1051(3)(A) (applicant must certify that he believes that he is the owner of the mark), (a)(3)(D) (applicant must certify that "to the best of the verifier's knowledge and belief, no other person has the right to use such mark in commerce. . . ."); see also 37 C.F.R. § 2.33(b). But, as discussed, Wittmann based his claim of ownership upon Star's use. He was not required to explain his connection to Star on his application. See T.M.E.P. § 1201.03(b) (7th ed. 2010) ("Where the application states that use of the mark is by a related company or companies, the USPTO does not require an explanation of how the applicant controls the use of the mark"). Further, Star cannot establish fraud simply by showing that Wittmann was mistaken, and it does not present clear and convincing evidence that Wittmann attempted

7

to mislead the USPTO. Nor does Star show that its rights to the mark were so clearly established that Wittmann's failure to disclose them constituted fraud. See Rosso & Mastracco. Inc. v. Giant Food, Inc., 720 F.2d 1263, 1266 (Fed. Cir. 1983). Therefore, Star has not demonstrated a likelihood of success on its fraudulent registration claim.

As discussed, to obtain a preliminary injunction Star must show that it has no adequate remedy at law and will be irreparably harmed absent preliminary relief. Even if Star fails to demonstrate a business loss, the law presumes that injuries arising from trademark infringement are irreparable. Abbott Laboratories v. Mead Johnson & Co., 971 F.2d 6, 16 (7th Cir. 1992). This is because the "most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another." Re/Max North Cent., Inc. v. Cook, 272 F.3d 424, 432 (7th Cir. 2001) (quoting International Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1092 (7th Cir. 1988)). The presumption is also founded upon the judgment that "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." Abbott, 971 F.2d at 16.

In the present case, Star and defendants use the identical mark on similar products and marketing materials. They compete for the same customers, often at the same trade fairs. Additionally, defendants operate websites that use the mark, seeking to attract Star's customers among others. Thus, Star demonstrates that it will suffer irreparable damage to its reputation if defendants use the mark while this action is pending. See Ideal

Industries, Inc. v. Gardner Bender, Inc., 612 F.2d 1018, 1026 (7th Cir. 1979) (stating that damage to the goodwill and prominence of plaintiff's trademark through public confusion of it with defendant's trademark is, in itself, an irreparable injury). Defendants argue that damages would adequately compensate Star because Star and defendants are the only producers of the patch and Star's losses can therefore be determined from defendants' sales figures. However, defendants' sales may not accurately measure the damage to Star's goodwill and reputation. Defendants' marketing activities may sufficiently confuse customers such that they decide not to purchase any patches. Customers may conclude that like the defendants' patches, Star's are limited to five abdominal reentries. Thus, I decline to depart from the well-settled principle that monetary damages are inadequate to compensate for infringement.

I turn now to whether the irreparable harm Star would suffer if I deny the injunction is greater than the irreparable harm defendants will suffer if I grant it. See Ty, 237 F.3d at 895. I must also take into consideration the public interest. Id. As previously discussed, the greater Star's likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted. Id. at 896. As also discussed, Star has demonstrated a strong likelihood of success on its infringement claim. If I were to deny the preliminary injunction and Star later prevailed, defendants would irreparably harm Star in the interim by using its mark to attract and confuse customers. If I were to grant the preliminary injunction and defendants later prevailed, defendants would needlessly have incurred lost sales and the costs of changing their promotional materials. This would result in the loss of goodwill and possibly in defendants' inability to resume their use of the mark. As to its effect on non-parties, an injunction would serve the public interest by preventing

consumer confusion in the marketplace. Promatek Indus., LTD v. Equitrac Corp., 300 F.3d 808, 814 (7th Cir. 2002). It could, however, potentially damage consumers by temporarily removing defendants' less expensive product from the marketplace.

Based upon the above considerations, I conclude that the harm that Star would suffer if I denied the injunction slightly outweighs the harm defendants would suffer if I granted it. I also conclude that the public interest favors granting the injunction. The harm to Star will exceed the harm to defendants because Star has used the mark for more than ten years whereas defendants are a startup with fewer than thirty sales. See, e.g. Miyano Mach. USA, Inc. v. Miyanohitec Mach., Inc., 576 F. Supp. 2d 868, 888 (N.D. Ill. 2008). Further, Wittmann's losses are mitigated by the fact that he owns 49% of Star. Finally, defendants deliberately used a mark already in use and thereby accepted the risk that they would need to change their marketing materials. Therefore, I will grant Star's application for a preliminary injunction.

Injunctions are based in equity and thus courts must remain flexible in weighing the appropriate relief. Abbott, 971 F.2d at 17-18. The scope of injunctive relief must not exceed the extent of the plaintiff's protectable rights. International Kennel Club, 846 F.2d at 1094. Defendants argue that I should limit injunctive relief to disclaimers affirming that they are not affiliated with Star. However, disclaimers would likely be ineffective in dispelling consumer confusion because Wittmann is involved with both enterprises and because the patches are marketed to the same customers. See id. at 1093 (stating that disclaimers are often ignored by consumers). Confusion will likely increase as both companies continue to market their patches. Further, confusion would likely cause customers to visit defendants' website. See Promatek, 300 F.3d at 812-813. Thus, I will

enjoin defendants and their agents from using the Wittmann Patch trademark or similar marks such as Wittmann Hypopack, wittmann-patch.com, wittmanpatch.com, or other marks beginning with Wittmann in connection with abdominal surgical patches.

Fed.R.Civ.P. 65(c) conditions a preliminary injunction on security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The purpose of an injunction bond is to protect the restrained party from damages that it would incur in the event that the injunction was wrongfully issued. Ty, Inc. v. Publications Int'l Ltd., 292 F.3d 512, 516 (7th Cir. 2002). The amount of the bond is left to the court's discretion. Gateway E. Ry. v. Terminal R.R. Ass'n, 35 F.3d 1134, 1141 (7th Cir. 1994). However, "a district court cannot simply set the bond at whatever high number it thinks appropriate; instead, reasons must support the number chosen so that a reviewing court can determine whether such number 'was within the range of options from which one could expect a reasonable trial judge to select.'" Builder's World, Inc. v. Marvin Lumber & Cedar, Inc., 482 F. Supp. 2d 1065, 1078 (E.D. Wis. 2007) (quoting Gateway, 35 F.3d at 1142-42). Because the damages caused by an erroneous preliminary injunction cannot exceed the amount of the bond posted as security, and because an error in setting the bond too high is not serious, district courts should err on the high side when setting bond. Mead Johnson & Co. v. Abbott Lab., 201 F.3d 883, 888 (7th Cir. 2000).

Van Deventer states that it will cost approximately $35,000 to change all of defendants' promotional materials while the action is pending and another $35,000 to reverse the changes should defendants prevail. Thus, the bond should be at least $70,000. Van Deventer further states that without use of the Wittmann mark defendants

will profit because they will lose sales to Star while the case is pending. However, given that defendants have sold a very modest number of kits to date and that they would be able to market their kits under a different name while the case is pending, it is unlikely that lost profits would be more than $50,000. Therefore, bond is set at $120,000.

For the reasons stated,

**IT IS ORDERED** that plaintiff's motion for preliminary injunction is **GRANTED**. The following preliminary injunction will be entered against defendants provided that plaintiff gives security by depositing with the Clerk the sum of $120,000 in a cashiers check or other certified funds within seven days of the date of this order: the defendants, their agents or anyone else working with or on behalf of the defendants are preliminarily enjoined and restrained, directly or indirectly, from using the Wittmann Patch trademark or any other trademarks similar to Wittmann Patch, including without limitation wittmann-patch.com, wittmanpatch.com, Wittmann Hypopack or variations of marks starting with Wittmann.

Failure to provide the requisite security will cause this order to lapse of its own accord. If plaintiff provides the requisite security, this preliminary injunction shall remain in effect until further order of the court.

Dated at Milwaukee, Wisconsin this 24th day of May, 2011.

/s_____
LYNN ADELMAN
District Judge