# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**STARSURGICAL INC.,**
            **Plaintiff,**

      **v.**                               **Case No. 10-CV-01156**

**APERTA, LLC, et al.,**
            **Defendants,**

**DIETMAR H. WITTMANN,**
            **Defendant/Third-Party Plaintiff,**

      **v.**

**MICHAEL DEUTSCH,**
            **Third-Party Defendant.**

---

## DECISION AND ORDER

In June 2000, Michael Deutsch and Dr. Dietmar Wittmann formed Starsurgical, Inc. ("Star"), a Wisconsin corporation. Subsequently, they had a falling out resulting in the present diversity case. In 1987, Wittmann, an employee of the Medical College of Wisconsin ("MCW"), invented a patch used to cover large incisions made during abdominal surgery. Later, Wittmann signed an Invention Memorandum assigning his rights in the patch to MCW's research foundation in exchange for a portion of future royalties. MCW in turn granted a license to Deutsch to manufacture and sell the patch.

Sale of the patch in the United States required the approval of the Food and Drug Administration ("FDA"). Deutsch asked MCW and Wittmann for data supporting his application for FDA approval, and Wittmann provided him with information about the patch. When Deutsch and Wittmann created Star, Deutsch assigned his rights to manufacture

and distribute the patch and the FDA certification to Star and became president of the corporation and a 51% shareholder. Wittmann became vice president and a 49% shareholder. Wittmann's wife, Heide Wittmann ("Heide"), became treasurer. Star's bylaws gave Deutsch, as majority shareholder, power to remove Wittmann as a director, but Wittmann claims Deutsch orally agreed that he would always be a director. Deutsch denies this.

Deutsch and Wittmann agreed that initially they would receive only nominal compensation and that Deutsch would be responsible for the day-to-day administration of Star, including patch production, quality control and marketing. Wittmann provided names of potential customers, assisted with marketing efforts and procured some of the materials needed for manufacturing the patch. He also used his own funds to procure Star's www.starsurgical.com domain name and created and operated what became the company's principal website. He listed Star as the owner of the site and himself as the site's administrator. Heide kept Star's books. Deutsch suggested using the trademark WITTMANN PATCH to sell the patch, and Wittmann agreed to allow Star to use his name. On April 25 2000, Star began using the mark and in 2001, Deutsch assigned his rights in the mark to Star and registered it with the Wisconsin Secretary of State. In 2002, Wittmann applied to the U.S. Patent and Trademark Office ("USPTO") for registration of the same mark in his name. Star did not oppose his application and in 2004, the USPTO registered the trademark to Wittmann.

Deutsch and Wittmann had a number of disagreements and in November 2002, Deutsch removed Wittmann and Heide from their positions. Deutsch also amended Star's by-laws to provide for a one-member board and increased his salary. Since then, Deutsch

has been Star's sole director and board member. Around 2006, Deutsch developed an Expandable Temporary Abdominal Closure ("XTAC") patch through Acute Care Surgical, LLC ("ACS"), another company he owned. In July 2007, Deutsch obtained FDA approval for the XTAC patch, which was somewhat similar to the Wittmann Patch, but it turned out to be a commercial failure. In 2009, Star's sole supplier of Wittmann Patches, Preservation Solutions, Inc. ("PSI"), informed Deutsch that it could no longer manufacture the Wittmann Patch because it was losing money. Deutsch offered it a higher per patch price, and PSI agreed to continue the relationship. Subsequently, PSI performed regulatory compliance-related services for Star in addition to manufacturing the patch. In 2009, Deutsch again raised his salary.

In 2009, Wittmann created another corporation, Aperta, Inc. ("Aperta"), and Aperta applied for FDA approval of a patch identical to the Wittmann patch but larger and capable of being re-opened more times before having to be replaced. In seeking FDA approval, Wittmann used the same information that Deutsch had used to obtain approval for the Wittmann Patch. In July 2010, Wittmann created NovoMedicus, LLC ("Novo") to sell surgical kits containing the new patch and hired Paul van Deventer as its president and Wittmann's son, Dr. Mark Wittmann ("Mark"), as a consultant. Heide also performed services for Novo. In September 2010, at a trade show Deutsch learned of the existence of Novo and that it was using the WITTMANN PATCH mark to sell competing patches. Novo called its surgical kits "Wittmann Hypopacks" and distributed them in boxes listing a "Wittmann Patch" as one of the components. It also distributed marketing materials stating that the Wittmann Hypopack and Wittmann Patch were protected by trademarks and that

other companies manufacturing or marketing the Wittmann Patch were in violation of such marks.

On the eve of the trade show, Wittmann, who had continued to administer Star's website, removed all of its content and replaced it with a page listing the www.starsurgical.com domain name as being for sale. The email address and phone number listed on the site belonged to Deutsch. Star asserts that Wittmann did this to help Novo, but Wittmann states that he did it because Star had failed to pay him $62,100 for operating its website. Star offered to pay Wittmann $3000 to cover the registration fees he had paid out of his own pocket, but Wittmann rejected the offer. Wittmann did not restore the site until 2012 by which point Star had developed a new site. In December 2010, Novo sent emails to some of Star's customers stating that Novo had not licensed the right to manufacture or market the Wittmann Patch in the United States and that any company doing so was violating Novo's rights. Novo ultimately failed and in July 2012, Wittmann dissolved it. However, he continues to sell patches using the Wittmann mark in Europe.

In the present case, in its third amended complaint, Star asserts a variety of claims against Wittmann and his associates, and defendants move for summary judgment on most of them. Star also moves for summary judgment on several of them. Defendants also assert counterclaims on which Star seeks summary judgment. In addition, Wittmann brings a third-party complaint against Deutsch on which Deutsch seeks summary judgment.

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable jury

4

could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986). Many of the parties' claims raise state law issues which the parties agree are governed by Wisconsin law.

As a preliminary matter, I address defendants's claim for declaratory judgment and breach of contract. Defendants have withdrawn the claims in the counterclaim and third-party complaint for a declaratory judgment related to the competition agreement and appear to have withdrawn their breach of contract claim. Defs.' Resp. to Starsurgical's and Mr. Deutsch's Summ. J. M. at 49, ECF No. 188. Therefore I will dismiss these claims.

## I.    Motions Relating to Star's Claims

### A.    Defendants' Motion for Summary Judgment on Star's Breach of Fiduciary Duty Claim

In Count 2, Star alleges that Wittmann breached a fiduciary duty by competing with it through Novo including infringing on its trademarks, tortiously interfering with its contracts with customers, shutting down its website and misappropriating its trade secrets. Ordinarily, a minority shareholder does not owe a corporation a fiduciary duty. Star, however, argues that the general rule is inapplicable here because Star was and is a closely held corporation, i.e. a corporation with few shareholders, no ready market for its stock and substantial majority shareholder participation in management. Some courts have held that a minority shareholder in a closely held corporation owes a duty of loyalty both to the corporation and other shareholders. *See, e.g.*, *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1218 (7th Cir. 1995) (applying Illinois law). These courts theorize that a closely held corporation is like a partnership and thus its shareholders owe a duty to each other and the corporation similar to that of partners —a duty to act in the "utmost good faith and loyalty."

*Donahue v. Rodd Electrotype Co. of New England, Inc.*, 328 N.E.2d 505, 512–15 (Mass. 1975).

Under Wisconsin law, majority shareholders in closely held corporations owe a fiduciary duty to the corporation and minority shareholders. *See Grognet v. Fox Valley Trucking Serv.*, 45 Wis. 2d 235, 241 (1969). But the Wisconsin Supreme Court has not determined whether or not minority shareholders owe a similar duty. *See Estate of Sheppard ex rel. McMorrow v. Specht*, 344 Wis. 2d 696, 702–03 (Ct. App. 2012). Thus, as a federal judge sitting in diversity I must predict how the court would rule if the present case were before it. *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002). In doing so, I look to the rulings of the state court of appeals for guidance, but that court has not addressed the issue either.[1]

I believe that the state supreme court would decline to impose a fiduciary duty on a minority shareholder such as Wittmann. First, unlike a majority shareholder a minority shareholder is not able to control a corporation and affect other shareholders' rights. *See Notz v. Everett Smith Group, Ltd.*, 312 Wis. 2d 636, 648 (Ct. App. 2008), *rev'd on other grounds*, 316 Wis. 2d 640 (2009). Second, although Wisconsin law has moved toward treating closely held corporations more like partnerships, the Wisconsin legislature has declined to impose a fiduciary duty on minority shareholders. Rather, in 1983, it enacted a statute enabling close corporations to obtain special protections, *see* Wis. Stat. § 180, such as operating without a board of directors, restructuring the transfer of stock and

---

[1] I disagree with defendants' argument that in *Sheppard* the court of appeals held that a minority shareholder in a closely held does not owe a fiduciary duty to the corporation. Rather, the court declined to address the issue simply stating that under existing law a minority shareholder does not owe such a duty. *Id.*at 702-–03.

allowing shareholders to establish relationships like partners. Deutsch and Wittmann could have incorporated Star under this statute but did not. In this context, I think it unlikely that the state supreme court would create a fiduciary duty in the present case.

Delaware, to which Wisconsin looks for guidance on corporate law, *Notz*, 316 Wis. 2d at 664, is instructive on this point: Its supreme court declined to supplement the state's close corporation statute by creating a rule to protect minority shareholders wishing to sell their stock. *Nixon v. Blackwell,* 626 A.2d 1366, 1379–81 (Del. 1993). The court read the statute as preempting the field noting that the shareholders could have negotiated protections additional to those provided by the statute but had not done so. *Id.* The Wisconsin Supreme Court would likely conclude similarly. Illinois law, on which Star relies, is distinguishable because unlike in Wisconsin, the Illinois Supreme Court recognized that shareholders in a close corporation owe one another a fiduciary duty in certain cases before the Illinois legislature enacted a close corporation statute. *Ill. Rockford Corp. v. Kulp*, 242 N.E.2d 228, 233 (Ill. 1968).

Thus, Wittmann is entitled to summary judgment on Star's breach of fiduciary claim.

## B. Defendants' motion for Summary Judgment on Star's Civil Conspiracy Claim

In Count 5, Star claims that defendants conspired to destroy it and used unlawful means to do so. Under Wisconsin law, a civil conspiracy is "a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful." *Radue v. Dill*, 74 Wis. 2d 239, 241 (1976). The plaintiff must present facts showing some agreement between the alleged

conspirators on the common end sought and some cooperation toward the attainment of that end. *Augustine v. Anti-Defamation League of B'nai B'Rith*, 75 Wis. 2d 207, 216 (1977).

Defendants argue that they cannot be held liable for conspiracy because they acted as agents of Novo and, thus, are protected by the intra-corporate conspiracy doctrine which provides that corporate officers acting within the scope of their employment cannot conspire with one another or with the corporation. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 & n.15 (1984); *Dombrowski v. Dowling*, 459 F.2d 190, 193, 196 (7th Cir. 1972); *Brew City Redevelopment Grp., LLC v. Ferchill Grp.*, 297 Wis. 2d 606, 628–29 (2006). The doctrine is based on the idea that officers' acts are acts of the corporation, and a corporation cannot conspire with itself. *Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990). However, the evidence suggests that defendants' concerted action began before Wittmann created Novo. On July 2, 2010, two weeks before the formation of Novo, defendants held a planning meeting, and defendant Van Deventer's notes indicate that the attendees created Novo in part to compete with and "make it financially stressful for Star." Murphy Decl. Ex. C, ECF No. 157-28. Defendants respond that these pre-Novo acts were, nevertheless, on behalf of Novo. Until, however, it is organized, a corporation does not exist, and persons attempting to act for it are not agents of it. *Hinkley v. Sagemiller*, 210 N.W. 839, 841(Wis. 1926). Thus, defendants are not entitled to summary judgment on Star's civil conspiracy claim.

### C. Both Parties' Motions for Summary Judgment on Star's Claims Related to its Trademarks

In Counts 8-10, Star brings claims related to its trademarks. First, it alleges that defendants Wittmann, Novo, Aperta and van Deventer infringed on its unregistered

WITTMANN PATCH trademark in violation of 15 U.S.C. § 1125(a) by using it to sell Novo's patches and seeks summary judgment on this claim. To prove trademark infringement, Star must establish that it owns a protectable mark and that defendants' use of the mark was likely to cause confusion among consumers as to the origin of defendants' product. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 898 (7th Cir. 2001). Wittmann's certificate of registration from the USPTO for the WITTMANN PATCH mark is prima facie evidence that he owns it. *See* 15 U.S.C. §§ 1057(b), 1115(a). Star's state registration does not carry such a presumption. However, "[t]he party who first appropriates the mark through use, and for whom the mark serves as a designation of source, acquires superior rights to it." *Johnny Blastoff, Inc. v. L.A. Rams Football Co.*, 188 F.3d 427, 434–35 (7th Cir. 1999). Thus, Wittmann's trademark is subject to Star's previously established common law rights. *Id.*

Defendants concede that Star was the first to use the WITTMANN PATCH mark, that it has used it continuously since 2000 and that such use would ordinarily be sufficient to establish ownership. Nonetheless, they claim Wittmann owns the mark because Star's use of it inured to his benefit under the related company doctrine, pursuant to which a trademark registrant can establish ownership of a mark by showing that it was first used by a "related company." 15 U.S.C. § 1055. A related company is one "controlled by the registrant or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark is used." 15 U.S.C. § 1127. "'The critical question is whether [the alleged trademark owner] sufficiently policed and inspected its licensees' operations to guarantee the quality of the products sold under its trademark to

the public.'" *Pneutek, Inc. v. Scherr*, 211 U.S.P.Q. 824 (T.T.A.B. 1981) (quoting *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959)).

Wittmann claims that he controlled Star's use of the mark and the quality of its goods through a trademark licensing agreement. A licensing agreement is usually raised as a defense to trademark infringement but can be offered as evidence of ownership of a trademark. *See, e.g.*, *Turner v. HMH Publ'g Co.*, 380 F.2d 224, 229 (5th Cir. 1967). Wittmann admits he had no written licensing agreement with Star but claims an implied agreement. Whether such an agreement existed depends on whether, considering the objective conduct of the parties, a reasonable person would believe that an agreement was reached. *Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 308 (E.D. Pa. 2000) (citing *U.S. Jaycees v. Phila. Jaycees*, 639 F.2d 134 (3d Cir. 1981)); *see also McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920, 922 (Fed. Cir. 1995).

Wittmann argues that the fact that Deutsch asked him for permission before Star incorporated Wittmann's name into its trademark proves that Wittmann gave Star a license to use his name. "The name or likeness of a living person cannot be used as a mark without express authorization . . . ." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 13:26 (4th ed.). However, Wittmann did not impose any restrictions on Star's right to use his name, and the evidence shows that Deutsch controlled the use of the WITTMANN PATCH trademark and the nature and quality of the goods sold under it. As Star's vice president, Wittmann may have had some control over product quality and the use of the mark but far less than Deutsch who controlled Star's operation, including patch production, quality control and marketing. Deutsch overruled Wittmann's objections

to Star's marketing and pricing strategies and ultimately removed Wittmann as a director. Wittmann clearly did not have authority to control Star's use of the WITTMANN PATCH trademark. And after he was removed as a director, Wittmann made no attempt to stop Star from using his name to obtain control over the mark. Rather, he allowed Star to continue using the mark.

Thus, if anything, Wittmann gave Star a "naked" trademark license under which the licensor cannot control the licensee's use of the trademark. *See Dawn Donut Co.*, 267 F.2d at 367. Without such control, no reasonable jury could find that Star was a related company and that its use of the WITTMANN PATCH mark inured to Wittmann's benefit. Thus, I conclude that Star is the owner of the mark. I also conclude that by failing to respond to Star's arguments on the point defendants have conceded that their use of the mark was likely to cause confusion. Thus, Star is entitled to summary judgment on this infringement claim against defendants Wittmann, Novo, Aperta and van Deventer.

Star's second trademark-related claim is that defendants Wittmann, Novo, Aperta and van Deventer infringed the Starsurgical and Wittmann Patch marks by using the STAR PATCH trademark to sell Novo's patches. Defendants concede that Star owns the STARSURGICAL trademark, and I have already concluded that it owns the WITTMANN PATCH mark. The only question is whether defendants' STAR PATCH mark was confusingly similar to Star's marks. Star has consistently used the marks together thus, I will consider them together. *See Schering-Plough Healthcare Products, Inc. v. Ing-Jing Huang*, 84 U.S.P.Q.2d (BNA) 1323 (T.T.A.B. 2007) (setting out the conjoint use rule under which two marks can be considered together). "Whether consumers are likely to be confused about the origin of a defendant's products or services is ultimately a question of

fact." *Autozone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008). Courts consider seven factors: "(1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree and care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and (7) the intent of the defendants to 'palm off' their product as that of another." *Id.*

Some of these factors favor Star and some favor defendants. The Star and WITTMANN PATCH marks, when considered together, are visually and aurally similar to STAR PATCH. Defendants' patches were almost identical to Star's, and they were sold to the same group of customers and through the same channels of trade. Star also presents evidence that several consumers were actually confused by the STAR PATCH trademark. However, the degree of care likely to be exercised by consumers is high because the parties were selling a specialty product to sophisticated consumers, including doctors and hospitals. And the parties' trademarks are not identical. Also, the fact that the parties marketed their products at the same trade shows gave customers the opportunity to compare the product packaging. Thus, I conclude that there is a genuine dispute of material fact as to whether defendants' use of the STAR PATCH trademark was likely to cause confusion as to the origin of defendants' product, and, accordingly, will deny Star's motion for summary judgment on this claim.

Star's last trademark-related claim is that Wittmann violated 15 U.S.C. § 1120 by fraudulently registering the WITTMANN PATCH trademark. Wittmann moves for summary judgment on this claim. Section 1120 prohibits registering a mark by a "false or fraudulent declaration or representation . . . ." "'Fraud in procuring a trademark registration or renewal

occurs when an applicant knowingly makes false, material representations of fact in connection with its application.'" *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009) (quoting *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986)). A party seeking damages for fraudulent registration "bears a heavy burden," *id.*, and must prove fraud by clear and convincing evidence. *Money Store v. Harriscorp Fin. Inc.*, 689 F.2d 666, 670 (7th Cir. 1982).

In his trademark application, Wittmann declared that he had a right to register the WITTMANN PATCH trademark because "[a]pplicant is using or is using through a related company the mark in commerce on or in connection with the below-identified goods/services" and that he believed he was "the owner of the trademark/service mark sought to be registered . . . ; [and] to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce . . . ." Decl. of Dietmar Wittmann, Ex. 2, ECF No. 150-2. As an example of his use of the trademark, Wittmann provided the USPTO with a picture of a box containing one of Star's patches displaying the WITTMANN PATCH mark. Star's name was on the box, but Wittmann cropped it out. Later, in his December 2009 declaration of continued use, he stated that, "[t]he mark has been in continuous use in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12©, and is still in use in commerce." Deutsch Decl. Ex. E, ECF No. 159-5. As part of the filing, he submitted a specimen to illustrate his continuing use, a photo of a package insert from a Wittmann Patch sold in Europe. He described it as "[a] photograph of the package insert that is currently distributed to surgeons that use the device with the trademark." *Id.*

Star contends that Wittmann knew that Star was not a related company, and Wittmann responds that he honestly believed that he had licensed Star to use the trademark and that he owned the mark based on Star's use of it. He points out that the mark contains his name and that Star asked him for permission to use it. I conclude that a jury must decide what Wittmann believed when he filed his application in 2002 and his subsequent declaration of continued use in 2009. By 2009, Wittmann had been out of Star for over seven years. He had been excluded from management and had no access to Star's product packaging. Thus, there is a genuine issue as to whether he reasonably believed that Star was still a related company.

### D. Defendants' Motion for Summary Judgment on Star's Tortious Interference with Contract Claim

In Count 4, Star alleges that defendants tortiously interfered with its contractual relationship with several customers by advising them that Star was infringing on Novo's intellectual property rights. Defendants move for summary judgment on this claim but focus on Star's relationship with PSI, presenting no argument related to Star's relationship with its *customers*. Thus, their motion will be denied.

### E. Defendants' Motion for Summary Judgment on Star's Misappropriation of Trade Secrets Claim

In Count 7, Star claims that Wittmann, Heide and Novo violated Wis. Stat. § 134.90 by misappropriating its trade secrets and using them to help Novo. Specifically, Star contends that defendants misappropriated financial data, including the "cost of goods sold, profit margins, marketing budget, overhead expenses and revenues," and information used to obtain FDA approval of the Wittmann Patch. Pl.'s Br. in Opp. at 52, ECF No. 160.

Defendants move for summary judgment arguing that neither financial data nor information submitted to the FDA constitutes a "trade secret" because Star failed to keep it secret.

To be a trade secret under § 134.90(1)© information must have value from not being generally known and be "the subject of efforts to maintain its secrecy that are reasonable under the circumstances." Such efforts must go beyond "normal business practices" like restricting access and requiring passwords; "[a]n employer must use additional measures to protect the confidentiality of information he considers to be a trade secret." *Maxpower Corp. v. Abraham*, 557 F. Supp. 2d 955, 961 (W.D. Wis. 2008). The statute does not require "absolute secrecy," *see Fail-Safe LLC v. A.O. Smith Corp*, 744 F. Supp. 2d 831, 856 (E.D. Wis. 2010), but "one who claims a trade secret must exercise eternal vigilance in protecting its confidentiality." *RTE Corp. V. Coatings, Inc.*, 84 Wis. 2d 105, 119 (1978). In determining whether companies have fulfilled this requirement, Wisconsin courts consider whether the company negotiated confidentiality agreements, kept documents locked up, limited access to information, restricted building access, denoted documents as "confidential," informed individuals that information was confidential, and allowed individuals to keep information after the business relationship had ended. *See BondPro Corp. v. Siemens Power Generation Inc.*, 463 F.3d 702 (7th Cir. 2006); *Fail-Safe LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d at 857–58; *La Calhene, Inc. v. Spolyar*, 938 F. Supp. 523 (W.D. Wis. 1996).

The question of whether a party took sufficient measures to protect the confidentiality of an alleged trade secret is generally a question of fact for the jury. *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725–26 (7th Cir. 2003). "[O]nly in

an extreme case can what is a 'reasonable' precaution be determined on a motion for summary judgment." *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991). In the present case, Deutsch asserts that Star's cost of goods sold, profit margins, marketing budget, overhead expenses and revenues are all confidential and secret and that Star took reasonable steps to maintain their secrecy. Deutsch also states that the data was in electronic format, was password-protected and access was restricted to him and other employees and independent contractors who need the information to perform their job. Star does not ask employees or independent contractors to sign a confidentiality agreement but Deutsch states that he has discussed confidentiality and its importance with employees and a contractors. In regard to the information related to FDA approval, Deutsch asserts that access to the information relating to FDA approval was restricted to himself and kept in a locked cabinet in a locked office in a locked building. This testimony raises a genuine issue of material fact concerning whether Star took sufficient measures to protect the secrecy of the information in question.

Defendants also seek judgment on Star's trade secret misappropriation claim on the ground that it has not shown that defendants acquired the financial data or the FDA approval information "under circumstances giving rise to a duty to maintain its secrecy or limit its use." Wis. Stat. § 134.90(2). Defendants argue that they owed no duty of confidentiality regarding the information at issue because Deutsch never advised them that the information was confidential or asked them to sign confidentiality agreements. Star responds that Wittmann obtained access to its trade secrets by virtue of his shareholder status and Heide because she was the company's treasurer. It also points to Deutsch's testimony that he talked to defendants about confidentiality. Although Wittmann's role as

minority shareholder did not ipso facto create a duty of confidentiality, taking the facts in the light most favorable to Star, a reasonable jury could find an implicit agreement between the Wittmanns and Star to keep the financial data and the FDA approval information confidential.

Finally, defendants argue that the FDA approval information belongs to Wittmann not Star or Deutsch. They assert that such information was not permanently assigned to Deutsch and Star and that their rights to it expired in 2007. Alternatively, defendants argue that the Invention Memorandum did not apply to future work, and Wittmann's work on the FDA approval occurred after the Invention Memorandum. Star responds that any information related to the FDA approval Wittmann obtained prior to his work at Star was assigned to Deutsch by MCW, Wittmann's employer at the time, and therefore belongs to Star and Deutsch, not Wittmann. Additionally, Star argues that any information Wittmann developed after the 1992 licensing agreement was the property of his employer, MCW (citing *Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403 (Fed. Cir. 1996)). Despite the fact that the licensing agreement between Deutsch and MCW appears to have expired in 2007, the information would still not revert to Wittmann but to MCW which licensed the information to Deutsch in the first place. Further, this dispute raises issues of material fact, including who "created" the information relevant to the FDA approval, when the information was created, and Wittmann's role in obtaining FDA approval. Thus, defendants' motion for summary judgment on Star's misappropriation of trade secrets claim will be denied.

### F. The Parties' Motions for Partial Summary Judgment on Star's Cybersquatting Claim

In Count 6, Star alleges that defendants violated 15 U.S.C. § 1125(d), the Anticybersquatting Consumer Protection Act (ACPA), by wrongful use of two domain names, www.wittmanpatch.com and www.starsurgical.com. Defendants move for partial summary judgment on Star's claim relating to domain name www.wittmanpatch.com. Star moves for partial summary judgment on its cybersquatting claim relating to the domain name www.starsurgical.com. To prevail on an ACPA claim, a plaintiff must show that (1) the mark is distinctive or famous, (2) that the domain name is "identical or confusingly similar to that mark," (3) that the defendant registered, trafficked in, or used the domain name, and (4) that the defendant had "a bad faith intent to profit from that mark." 15 U.S.C. § 1125(d). In determining whether bad faith existed, courts consider a number of factors specified in 15 U.S.C. § 1125(d)(1)(B)(I). The statute also includes a safe harbor provision stating that bad faith intent "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." § 1125(d)(1)(B)(ii).

Star alleges that defendants acted in bad faith when they registered the domain name www.wittmanpatch.com and similar domain names, arguing that defendants intended to divert business from Star to Novo and to cause confusion between their products. Wittmann claims he honestly believed that he, not Star, owned the WITTMAN PATCH mark. He points out that the mark contains his name, that he invented it, that it is associated with him in the medical community and that he never used the domain name to compete with Star. Thus, there are facts suggesting that Wittmann acted in good faith,

and facts suggesting the contrary. Star owned the WITTMAN PATCH mark; the domain name is identical to that mark; Star used the mark for years before Wittmann registered the domain name and there is evidence of customer confusion. Thus, there is a genuine issue of material fact, and defendants' motion for summary judgment on the cybersquatting claim as to www.wittmanpatch.com must be denied.

With respect to the domain name www.starsurgical.com, Star argues that the Star mark is presumptively distinctive because it is a registered trademark, that it owns the mark, that the domain name is identical to the mark, and that Wittmann acted in bad faith when he removed the content of the webpage and tried to sell it back to Star. Defendants dispute that Wittmann acted in bad faith asserting that his actions represented a good-faith effort to obtain reimbursement for expenses and compensation for setting up the website. They also contend that they attempted to avoid confusion and harm to Star by directing website viewers to Star.

Taking the evidence in a light most favorable to defendants, I conclude that no reasonable jury could find that defendants acted in good faith. First, defendants had no right in the mark Starsurgical, and the domain name was identical to the mark. Second, unlike www.wittmanpatch.com, the domain does not contain Wittmann's name. Third, defendants never used www.starsurgical.com for business purposes except in relation to their employment at Star. Fourth, Star presents undisputed evidence that supports the conclusion that Wittmann intended to at best create a likelihood of confusion and at worst divert consumers. Specifically, Wittmann removed the content of the website in 2010 shortly before launching Novo. Wittmann did not inform Star of what he had done. Star found out after the September 2010 trade show, where it distributed promotional materials

directing customers to www.starsurgical.com. These facts indicate that defendants intended to confuse consumers as to Star's continued existence. No reasonable jury could find the timing coincidental. Wittmann's argument that he did not act in bad faith because he was using the website as leverage to obtain reimbursement for his work on the site also cuts against him. He presents no evidence that the compensation he sought, over $60,000, was bargained for. Moreover, he used such leverage in order to profit which itself is an indicia of bad faith. *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1219–20 (9th Cir. 2010) ("As for whether use to get leverage in a business dispute can establish a violation, the statutory factors for 'bad faith intent' establish that it can."). Nor is his invocation of the safe harbor provision persuasive. Here, defendants used the www.starsurgical.com domain name to confuse Star's customers and as leverage in financial negotiations. Thus, Star is entitled to partial summary judgment on this claim.

### G. Defendants' Motion for Summary Judgment on Star's Conspiracy to Injure Business Claim

In Count 1, Star alleges that defendants conspired to injure its business, in violation of Wis. Stat. § 134.01 which bars "[a]ny 2 or more persons" from "combin[ing] . . . for the purpose of willfully or maliciously injuring another in his or her reputation, trade, business or profession." An injured party may bring a damage action under this statute. *Brew City Redevelopment Grp., LLC*, 297 Wis. 2d at 617. Defendants seek summary judgment on this claim arguing that they neither acted with malice nor combined. "Malice is an integral element" of a claim under Wis. Stat. § 134.01. *Maleki v. Fine-Lando Clinic Chartered, S.C.*, 162 Wis. 2d 73, 86 (1991). To be malicious, an action must go beyond competition "that incidentally harms another when the purpose [of the action] is to improve one's competitive

advantage." *Id.* at 87 n.9. The conduct must be "intended to cause harm for harm's sake." *Id.* at 86.

Defendants argue that their actions were competitive rather than intended to cause harm for harm's sake. However, Star contends that defendants intended to injure it by reducing the value of its shares in an effort to force Deutsch to sell his shares to Wittmann or go out of business. Star cites Wittmann's feeling of "betrayal" by Deutsch, his removal of Star's content from the www.starsurgical.com website defendants' attempt to recruit PSI from Star, the use of the WITTMAN PATCH trademark without Star's consent and the distribution of promotional materials implying that Star was infringing on defendants' trademark rights. Viewed in a light most favorable to Star, a reasonable jury could find that defendants were motivated by more than a drive to compete.

As to whether defendants combined, the intracorporate conspiracy doctrine, discussed in the context of Star's civil conspiracy claim, also applies to its conspiracy to injure business claim. *See Brew City Redevelopment Grp., LLC*, 297 Wis. 2d at 628–29. Again, I conclude that defendants are not entitled to summary judgment because there is evidence suggesting that the alleged conspiratorial acts began before Wittmann created Novo.

### H. Defendants' Motion for Summary Judgment on Star's Common Law Unfair Competition Claims

In Count 3, Star alleges unfair competition. There are several types of common law unfair competition claims. *See Deslee & Cie., S.A. v. Nemmers,* 190 F. Supp. 381, 386 (E.D. Wis. 1961) (distinguishing two categories of unfair competition claims); *Mercury Record Prods., Inc. v. Econ. Consultants, Inc.*, 64 Wis. 2d 163, 173–74, (1974)

(recognizing three causes of action under the common law unfair competition doctrine); *Restatement (Third) of Unfair Competition* § 1 (1995) (listing at least three distinct acts that give rise to liability); *see also Echo Travel, Inc. v. Travel Associates, Inc.* 870 F.2d 1264, 1266 (7th Cir. 1989) (outlining the elements of unfair competition based on trademark infringement). The parties here do not discuss the different types of claims. They agree that the fate of Star's unfair competition claim depends on the outcome of other of its claims such as its breach of fiduciary duty, misappropriation of trade secrets, and tortious interference claims. Because I denied defendants' summary judgment motion in two of the three mentioned underlying tort claims, I will deny it here as well.

## II.    Motions Relating to Defendants' Claims

Defendants' bring a variety of claims against Star and Deutsch but have dropped some of them. I address here the motions by Star and Deutsch addressing what appear to be defendants' remaining claims.

### A.    Deutsch's Motion for Summary Judgment on Wittmann's Breach of Fiduciary Duty/Shareholder Oppression Claim relating to Deutsch's Raises

In Count 3 of the third party complaint, Wittmann asserts that Deutsch breached his fiduciary duty to Wittmann, as a minority shareholder, and engaged in shareholder oppression by compensating himself unreasonably without comparably compensating Wittmann. Deutsch contends that Wittmann's claim regarding the 2002 raise is barred by the two-year statute of limitations in § 893.57. He contends that Wittmann's claim accrued in 2002, when Deutsch gave himself a raise and that it is therefore time-barred. Wittmann

argues that the continuing violation rule applies and that a new claim accrued each time Deutsch received a paycheck.

Generally, a tort claim accrues when the injury is discovered or reasonably should have been discovered. *Stuart v. Weisflog's Showroom Gallery, Inc.*, 308 Wis. 2d 103, 116–17 (2008). The continuing violation doctrine is an exception to this general rule. It provides that when a single act gives rise to continuing injuries or when a series of acts gives rise to a cumulative injury, a plaintiff can reach back to the beginning even if it is outside the statute of limitations. *Heard v. Sheahan*, 253 F.3d 316, 319–20 (7th Cir. 2001). However, the continuing violation doctrine does not apply to situations in which there is a single act with linger effects. "An untimely . . . suit cannot be revived by pointing to effects within the limitations period of unlawful acts that occurred earlier." *Dasgupta v. Univ. of Wis. Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir. 1997). Only unlawful acts which take place within the limitations period are actionable. *Id.* A lingering effect is not itself an unlawful act, and a refusal to correct the effects of a violation is also not an unlawful act. *Id.*

In this case, Deutsch gave himself allegedly improper raises in 2002 and 2009. I conclude, however, that the checks he subsequently received reflecting these raises are the effects of the raises and not themselves actionable. Wittmann knew of these raises when they occurred and could have brought a claim. To allow him to wait until years later "would render the statute of limitations for breach of fiduciary duties . . . effectively meaningless." *In re Gerhard G. Poehling Family Trust*, No. 2012-AP-1817, 2013 WL 208894 at *10–11 (Ct. App. May 16, 2013) (concluding that the continuing violation

exception does not apply to discrete acts, which are acts that "occurred independently, could be distinguished on an individual basis, and had corresponding, ascertainable injuries"). Defendant cites *Noonan v. Nw. Mut. Life Ins. Co.*, 276 Wis. 2d 33 (Ct. App. 2004), in which each underpayment of an annual dividend was treated as a separate breach. But in *Noonan*, the insurer had a contractual duty to pay dividends annually, and each year it made a discrete decision to underpay. In the present case, Deutsch did not make a discrete decision each time he received a paycheck; rather the paychecks were merely lingering effects.

However, Wittmann brought this suit within two years of the 2009 raise. Deutsch argues that it should not be considered a discrete decision, but an effect of the 2002 raise. I disagree. The raise in 2009 was a separate, discrete act and the statute of limitations had not run when Wittmann commenced this action.

**B.** **Deutsch's Motion for Summary Judgment on Wittmann's Breach of Fiduciary Duty/Shareholder Derivative Claims relating to Deutsch's Alleged Misappropriation of Funds, Competition with Star and Excessive Payment to PSI**

In Count 2 of his third party complaint, Wittmann alleges that Deutsch breached his fiduciary duty to Star derivatively and/or to himself as a minority shareholder, by misappropriating funds to assist ACS, a company Deutsch owned, in marketing and selling XTAC in competition with Star and by paying unreasonably high prices to PSI for supplying Wittmann Patches. Deutsch first challenges Wittmann's right to bring a shareholder derivative claim. Under Wis. Stat. § 180.0741, a shareholder must "fairly and adequately represent the interests of the corporation" in order to bring a derivative action. In determining whether a shareholder can adequately represent a corporation's interests in

a derivative action, Wisconsin courts look to the remedies the shareholder seeks, the degree of support the shareholder has from other shareholders and the shareholder's motives and loyalty to the company. *Read v. Read*, 205 Wis. 2d 558, 567–69 (Ct. App. 1996).

In the present case, Wittmann seeks a mix of remedies on behalf of Star and himself, including corporate dissolution, a particularly harsh remedy. However, he has a substantial interest in Star, 49%, and is the only person able to challenge Deutsch's allegedly wrongful conduct. Deutsch argues that Wittmann's motives are malicious and that he formed Novo to harm Star. He cites Wittmann's deposition testimony that he formed Novo to force Deutsch to merge the companies and discounts Wittmann's later declaration that he formed Novo to promote education and provide the Wittmann Patch at an affordable price. As previously discussed, Wittmann's motive for forming Novo is a credibility issue for the jury. I conclude that whether Wittmann fairly and adequately represents Star's interests is also an issue for the jury.

Next, Deutsch asks me to grant summary judgment on Wittmann's breach of fiduciary duty claim as it relates to Deutsch's marketing of XTAC. He asserts that Star and Wittmann suffered no injury because Deutsch used his own funds, that XTAC failed to make a profit, and Star lost no customers because of it. In response, Wittmann asserts that ACS sold some XTAC, and that certain of Deutsch's emails could enable a reasonable juror to view him as marketing XTAC rather than the Wittmann Patch. Taking the facts in his favor, Wittmann presents enough to withstand Deutsch's motion.

Finally, Deutsch asks me to dismiss Wittmann's breach of fiduciary duty claim as it relates to Deutsch's decision to pay PSI a higher price for supplying the patches based

on the business judgment rule. The business judgment rule shields corporate officers from liability for decisions made in good faith and creates an evidentiary presumption that an officer or director's decisions are made in good faith. *Reget v. Paige*, 242 Wis. 2d 278, 294–95 (Ct. App. 2001); *Einhorn v. Culea*, 235 Wis. 2d 646, 656 (2000). To survive Deutsch's motion, Wittmann must establish a prima facie case that Deutsch's action was overreaching, fraudulent, or unreasonable. *Reget*, 242 Wis. 2d at 294–97. Wittmann asserts that Deutsch did not investigate alternatives to PSI and that, if he had, he could have obtained a better price. He also asserts that Deutsch was afraid of change and that he acted to protect ACS's relationship with PSI. However, these assertions are largely conclusory and fail to satisfy the prima facie case requirement. Therefore, as to this claim, Deutsch's motion will be granted.

### C. Deutsch's Motion for Summary Judgment on Wittmann's Unjust Enrichment Claim

In Count 5 of his third party complaint, Wittmann alleges that Deutsch unjustly enriched himself when he raised his salary. Deutsch argues that this claim is barred by laches, an equitable doctrine which bars claims that proponents delay asserting. *Zizzo v. Lakeside Steel & Mfg. Co.*, 312 Wis. 2d 463, 469–70 (Ct. App. 2008). Both parties agree that when determining whether laches bars a claim I am guided by applicable statutes of limitations. Deutsch argues that Wittmann's unjust enrichment claim is simply a repackaging of his breach of fiduciary duty claims and is governed by the two year limitation period. Wittmann argues that the claim is more like a wrongful taking of personal property claim and governed by the six year statute specified in Wis. Stat. § 893.51. I agree with Deutsch that Wittmann's unjust enrichment claim is a reframing of his breach

of fiduciary duty claims and should be treated comparably. Thus, Wittmann may proceed on his unjust enrichment claims related to Deutsch's compensation as it relates to the 2009 raise.

Wittmann also alleges that Deutsch unjustly enriched himself when he marketed XTAC and agreed to pay PSI a higher price. Wittmann may also proceed on his unjust enrichment claim related to Deutsch's marketing of XTAC because I found that there are fact issues in the underlying breach of fiduciary duty claim. Wittmann may not continue with an unjust enrichment claim related to Deutsch's decision to pay PSI a higher price because I found that that decision is protected by the business judgment rule.

### D. Deutsch's Motion for Summary Judgment on Defendants' Claim that Deutsch Operated Star in an Oppressive Manner Justifying an Accounting and/or Corporate Dissolution

Defendants allege, based on their claims discussed above, that Deutsch acted in an illegal, oppressive, and fraudulent manner towards Star and Wittmann, and they request an accounting and/or a corporate dissolution under Wis. Stat. § 180.1430(2)(b). The outcome of this claim depends on the resolution of issues previously discussed. Also accounting and corporate dissolution are essentially remedies rather than independent claims. Therefore, I will defer consideration of this matter until other issues have been resolved.

**THEREFORE, IT IS ORDERED** that defendants' motion for partial summary judgment (ECF No. 148) is **GRANTED IN PART** and **DENIED IN PART**.

The motion is **GRANTED** as to Star's claim for breach of fiduciary duty.

The motion is **DENIED** as to Star's claim for civil conspiracy.

The motion is **DENIED** as to Star's claim for fraudulent trademark registration.

The motion is **DENIED** as to Star's claim for tortious interference with contract.

The motion is **DENIED** as to Star's claim for trade secret misappropriation.

The motion is **DENIED** as to Star's claim for cybersquatting.

The motion is **DENIED** as to Star's claim for conspiracy to injure business.

The motion is **DENIED** as to Star's claim for unfair competition.

**IT IS FURTHER ORDERED** that Star's motion for summary judgment (ECF No. 156) is **GRANTED IN PART** and **DENIED IN PART**.

The motion is **GRANTED** as to defendants' claim for declaratory judgment.

The motion is **GRANTED** as to Wittmann's claim for breach of contract.

The motion is **GRANTED** as to Star's claim for trademark infringement related to the WITTMANN PATCH, except against defendants Heide and Mark Wittmann, and **DENIED** as to Star's claim for trademark infringement related to STAR PATCH.

The motion is **GRANTED** as to Star's claims for cybersquatting related to www.starsurgical.com.

The motion is **GRANTED** as to Wittmann's breach of fiduciary duty/shareholder derivative claim related to Deutsch's decision to increase the price paid to PSI and **DENIED** as to Wittmann's breach of fiduciary duty/shareholder derivative claim related to Deutsch's marketing of XTAC.

The motion is **DENIED** as to Wittmann's claim for breach of fiduciary duty/shareholder oppression related to Deutsch's compensation.

The motion is **DENIED** as to Wittmann's claim for unjust enrichment.

The motion is **DENIED** as to defendants' claim for corporate dissolution.

The motion is **DENIED** as to defendants' claim for an accounting.

Dated at Milwaukee, Wisconsin, this 14th day of August, 2014.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge